FILED

2006 Dec-11  PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| INGRID REEVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER: |
| | ) | 2:06-CV-358-IPJ |
| C.H. ROBINSON WORLDWIDE, | ) | |
| Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the court is the summary judgment motion of defendant C.H. Robinson Worldwide, Inc., ("CHRW") (doc. 10), supporting brief (doc. 11), and evidentiary materials (doc. 12).  Plaintiff Ingrid Reeves filed a brief in opposition to CHRW's motion for summary judgment with supporting evidentiary materials (doc. 14) to which CHRW filed a reply (doc. 15).

## FACTUAL BACKGROUND

In July 2001 Reeves began working in the Birmingham, Alabama branch office of CHRW as a transportation sales representative.  Reeves Decl. at ¶ 1.  David Mitchell was the branch manager of the CHRW's Birmingham branch and Reeves's direct supervisor throughout her employment with CHRW.  Reeves Decl. at ¶ 1.

1

Reeves worked for CHRW until March 24, 2004, when she resigned from CHRW. Reeves Dep. at 65-68.  On February 23, 2006, Reeves sued CHRW alleging that she was subject to unlawful sexual harassment (doc. 1).  Specifically, Reeves alleged that the "foul and vulgar language" spoken by her male coworkers and the "sexually vulgar radio station" that was played in the office created a hostile work environment in violation of Title VII.  Compl. at ¶¶ 9, 10, 16; Reeves Dep. at 119-120.

Before working at CHRW, Reeves worked in some professions and industries where cursing on the job was commonplace.  Reeves Dep. at 130.  Throughout Reeves's employment at CHRW, employees in the Birmingham branch used "everyday cursing" in the office.  Reeves Dep. at 139-140. Reeves was not offended by the use of some words in the office, and she understood that in the transportation industry there would be a lot of cursing.  Reeves Dep. at 165-166, 169, 288-289; Def.'s Ex.s 16, 27, and 29 to Reeves Dep.  Reeves used some curse words such as "shit," "damn," and "asshole" in the work place while she was working at CHRW. Reeves Dep. at 138-139.  Reeves used these words when she would become angry and frustrated on the job, but she did not direct these words at another person.  *Id*. The CHRW Birmingham branch office had a "cuss cup," and if an employee said a curse word in the office, the employee would put money into the cup.  Reeves Dep. at 144-145.   Reeves did contribute to the "cuss cup" while she worked at CHRW.

2

*Id.*

Reeves was offended when the language in the office got "really bad." Reeves Dep. at 147-148; Def.'s Ex. 29 to Reeves Dep. Reeves sent an e-mail to Mitchell explaining to him that she was "totally fine" with swearing, but that she was offended when language in the office became excessive, sexually offensive, or when words were used in a sexual context. Reeves Dep. at 146-148, 161; Def.'s Ex. 29 to Reeves Dep. When Reeves heard language in the office that was beyond "everyday foul language," if she had time, she would type an e-mail to herself or write notes in her day planner describing what she heard to create a record of the event. Reeves Dep. at 140-141. Reeves stated in her deposition that offensive behavior "went on every day" and that "if you were to pull out a calendar right now and I were to look at, you know, summer of 2001 to spring of '04, I could point at every day of the year that some of this behavior went on." Reeves Dep. at 228.

Reeves was particularly offended by the language used by her coworker Scott Gagliardi, and she considered him to be the person that cussed the most in the office. Reeves Dep. at 148-149; Def.'s Ex. 27 to Reeves Dep. Reeves stated in her deposition that "day in and day out" Gagliardi would use sexually offensive language, phrases, jokes, songs, comments, and remarks. Reeves Dep. at 155, 162, 183. Gagliardi would usually use language that Reeves found offensive while he was on

3

the telephone or immediately after he hung up the telephone.  Reeves Dep. at 152.

However, Gagliardi did not direct his cursing at his coworkers in the CHRW office.

Reeves Dep. at 161-162.  Reeves agreed that Gagliardi did not care who was in the

office when he was cursing.  Reeves Dep. at 162.  Gagliardi would use words like

"fuck," "bitch," and "whore."  Reeves Dep. at 162-163.  On February 25, 2002,

Reeves overheard Gagliardi tell a joke with a punch line "fuck your sister and your

mother is a whore."  Reeves Dep. at 187-188; Def.'s Ex. 19 to Reeves Dep.  Mitchell

and other employees laughed at the joke, and Reeves stated that "jokes like this" were

commonplace.  Reeves Dep. at 188-189.  On March 12, 2002, Reeves overheard

Gagliardi call a driver a "fucking whore."  Reeves Dep. at 184; Def.'s Ex. 18 to

Reeves Dep.  Reeves does not know if Gagliardi was talking to a male or female

driver on that occasion.  Reeves Dep. at 186-187.   On March 25, 2002, Reeves

confronted Gagliardi in an e-mail message and asked him not to say "Jesus fucking

Christ."  Reeves Dep. at 190; Def.'s Ex. 20 to Reeves Dep.  On April 9, 2002, Reeves

heard Gagliardi say to a female dispatcher "you fucking whore."  Reeves Dep. at 191;

Def.'s Ex. 21 to Reeves Dep.  In June 2004 Reeves heard Gagliardi say "Fuck you,

fucking fuck.  Fuck you."  Reeves Dep. at 194-195; Def.'s Ex. 22 to Reeves Dep.

Reeves does not know if Gagliardi was talking to anyone in particular when he made

that statement.  Reeves Dep. at 195.  On October 8, 2002, Reeves had a conversation

with Gagliardi about his language and she told him that it was hard for her to work when he swore so much and so loudly.  Reeves Dep. at 173-174; Def.'s Ex. 15 to Reeves Dep.  In response, Gagliardi apologized to Reeves.  Def.'s Ex. 15 to Reeves Dep.  Reeves stated that this was not the first time that she confronted Gagliardi about his language.  Reeves Dep. at 174.  On March 10, 2003, Reeves heard Gagliardi call a male carrier a "crack whore" and saying "fucking this" and "fucking that" while talking to the carrier.  Reeves Dep. at 182-183; Def.'s Ex. 17 to Reeves Dep.  Mitchell walked over to Gagliardi after the incident and told him to just "let it go next time."  Reeves Dep. at 182-183; Def.'s Ex. 17 to Reeves Dep.  Later that day, Reeves sent Gagliardi an e-mail to express her concerns about his cursing.  Reeves Dep. at 174-176; Def.'s Ex. 16 to Reeves Dep.   Reeves wrote in the e-mail that when his language "crosses the line," it offended her.  Def.'s Ex. 16 to Reeves Dep.  On an unknown date, Reeves heard Gagliardi say that another female employee had "a big one" in reference to her "ass."  Reeves Dep. at 166-167.  Also on an unknown date, Reeves heard Gagliardi refer to someone as a "cunt."  Reeves Dep. at 238-240.

Reeves stated that whenever she would confront Gagliardi about his language, she would "address him verbally initially" and then Reeves and Gagliardi would communicate by e-mail.  Reeves Dep. at 180.  Gagliardi would usually apologize in the e-mail and his language would improve for the rest of the day.  *Id.*  However, the

next day, Gagliardi would still use offensive language. *Id.* Another employee, Trent Patterson, also confronted Gagliardi about his cursing following an incident where Gagliardi cursed dispatchers who worked for Patterson. Reeves Dep. at 178-179.

Reeves was also offended by comments made by coworker Jeff Fox. Reeves Dep. at 201-208. Reeves heard Fox state that he "can always get off" in response to a song that Patterson was singing about "women's teeth on a man's dick." Reeves Dep. at 201. Reeves told Fox that she could not believe that he had made that comment. Reeves Dep. at 202. In early 2002 Reeves heard Fox tell Patterson and coworker Jeremy Hines a story about an experience he had in a hotel with naked women. Reeves Dep. at 204-205. Patterson and Hines "joined in" the conversation and also started talking about women and sexual experiences. Reeves Dep. at 206-207. Reeves was not party to the conversation, but she overheard the conversation. Reeves Dep. at 208. Reeves stated that this type of conversation was "just commonplace" and it was "accepted as normal." Reeves Dep. at 205-206. Reeves also stated that "this was just one example of many" occasions when "things like that" were discussed in the office. Reeves Dep. at 206. Mitchell was in the room but he did not stop the conversation. Reeves Dep. at 205. On the day before his last day working at CHRW, Fox told Reeves that since it was his last day, he could behave any way that he wanted and that she should bring earplugs to work. Reeves Dep. at

203; Def.'s Ex. 24 to Reeve's Dep.  Reeves stated that Fox's "last day was just like any other day: full of sexually offensive remarks, comments, stories, conversation, language -- just like any other day."  Reeves Dep. at 203.  However, Reeves does not have any specific memories of anything that occurred on Fox's last day.  Reeves Dep. at 203-204.

Reeves was also offended by some of the comments made in the CHRW office by Patterson.  Reeves Dep. at 232-235.  For example, on March 14, 2002, Patterson repeated a comment made to him by a "crazy dispatcher."  Reeves Dep. at 232-233.  Specifically, Patterson explained to his coworkers that the dispatcher had said to him "how big is you dick, can you put it in me?"  Reeves Dep. at 232-233; Def.'s Ex. 26 to Reeves Dep.  Reeves responded by sending an email to Patterson asking him not to make that sort of comment.  Reeves Dep. at 233-234; Def.'s Ex. 26 to Reeves Dep. Patterson responded by apologizing and stating that he would not have made the comment if he had known she was in the room.  Reeves Dep. at 234; Def.'s Ex. 26 to Reeves Dep.  Reeves was satisfied with Patterson's apology but she was disappointed that "this sort of thing just continued."  Reeves Dep. at 234-235.

Reeves was also offended when, on one occasion, Reeves walked by the computer of her coworker Darryl Harris, and he had an image of a naked woman on his computer.  Reeves Dep. at 376.  Reeves confronted Harris about the incident and

Harris apologized.  Reeves Dep. at 377-378.

Reeves was also offended by some of the comments made by Mitchell.  Reeves Dep. at 246-247.  Mitchell used sexually offensive language and had sexually offensive conversations on a daily basis in the office.  Reeves Dep. at 109.  Mitchell also accepted and tolerated the same behavior in coworkers.  Reeves Dep. at 109.  Reeves heard Mitchell use the words "fucking prick" when he was angry or frustrated.  Reeves Dep. 279-280.  Reeves does not know whether Mitchell was talking to a male or female when he made this comment.  Reeves Dep. at 280.  On one occasion, Reeves heard Mitchell make a comment about another female employee after the employee left the room.  Reeves Dep. at 167.  Specifically, Reeves heard Mitchell say that the female coworker "may be a bitch, but she can read."  Reeves Dep. at 167.  On another occasion, Reeves overheard a conversation between Mitchell and Hines.  Reeves Dep. at 262-263.  Hines told Mitchell that he had pornography at home and Hines asked Mitchell if he wanted to see his pornography.  Reeves Dep. at 263.  Mitchell declined Hines's offer and explained that he already had a subscription to Playboy.  *Id.*  Reeves also heard Mitchell say that he was able to renew his subscription to Playboy magazine before he got married, and Reeves believed that Mitchell was proud of himself for renewing his subscription.  Reeves Dep. at 263-264.  After Mitchell verbalized that he read Playboy magazine, it made

8

Reeves very uncomfortable when she was around Mitchell.  Reeves Dep. at 264.  On June 5, 2002, Reeves's third day working at CHRW, she overheard a conversation between Mitchell and a female customer.  Reeves Dep. at 216-218.  Reeves could tell that Mitchell was getting frustrated and that he became angry with the customer.  Reeves Dep. at 217-218.  Mitchell put the call on hold and told Reeves to "[t]alk to that stupid bitch on line 4."  Reeves Dep. at 218; Def.'s Ex. 25 to Reeves Dep.  Reeves met with Mitchell after the incident and told him that the way he talked made her uncomfortable.  Reeves Dep. at 219-220.  Mitchell apologized for "snapping" at Reeves, but also told Reeves "this is just the way I am, and you will just have to learn to ignore it."  Reeves Dep. at 220.  Reeves sent an e-mail to herself about the incident on May 7, 2002.  Reeves Dep. at 224-225; Def.'s Ex. 25 to Reeves Dep.  On July 30, 2003, Reeves heard Mitchell say that Jackie Burt, a former employee, was "a lazy, good-for-nothing bitch."  Reeves Dep. at 198; Def.'s Ex. 23 to Reeves Dep.  Mitchell stated in his deposition that he used the term "bitch" to refer to both men and women.  Mitchell Dep. at 83.

The offensive language in the office offended other employees as well.  Reeves Dep. at 169-173.  Specifically, Patterson, Jonathan Bridges, and John Bartell were also offended by some of the language used in the CHRW office.  *Id.*

On July 22, 2003, Reeves wrote a memo concerning language used in the

office.  Reeves Dep. at 236-237; Def.'s Ex. 27 to Reeves Dep.  In the memo, Reeves stated that she could tolerate some bad language but that she had "to draw the line somewhere," and she listed the words and phrases to which she objected.  Def.'s Ex. 27 to Reeves Dep.  Reeves also wrote in the memo that the most offensive language came from Gagliardi and that she had spoken with Gagliardi twice about the problem. *Id.*  Reeves explained in the memo that she had also spoken to Mitchell "several times" about the situation but the problem had not been resolved.  *Id.*  During her employee evaluations, Reeves also discussed with Mitchell her concerns regarding the language used in the office, and Reeves specifically talked to Mitchell about the language used by Gagliardi.  Reeves Dep. at 179-180.  Reeves stated that nothing changed after she raised these concerns and the language continued.  *Id.*

The CHRW Birmingham branch office has an office radio that employees listened to while working.  Reeves Dep. at 252; Mitchell Dep. at 70.  One of the stations that the employees would listen to on the office radio was FM 107.7 ("the X"), an alternative rock station.  Reeves Dep. at 253; Mitchell Dep. at 70-71.  The employees would listen to the morning show that aired on the X that concluded at 9 or 10 am.  Reeves Dep. at 253-55.  The show was hosted by two men, Tim Tuttle and Kevin Kline.  Reeves Dep. at 254.  Eventually, the two male hosts were joined by a female host.  Reeves Dep. at 256.  The show covered a variety of topics such a

celebrity interviews, current events, news, and pop culture.  Reeves Dep. 256-257.

Reeves stated in her deposition that it was a "Howard Stern type of sexual talk show"

and that the radio show aired sexually offensive language, jokes, comments,

advertisements, and songs.  Reeves Dep. at 120-121.

Reeves was offended by the following material that was broadcasted on the X

morning radio show: discussions about sex; a discussion about breast sizes and about

celebrity breast size; a discussion about old people having sex; a statement about

womens' nipples, a discussion about masturbation with horses; repeated statements

by one of the deejays that he enjoyed watching pornography; a discussion about erotic

dreams and ejaculation; a discussion about how many times characters on a television

show had sex; a discussion about lesbian Playboy Playmates; a deejay's statement,

"Robin, Robin, you make my groin a throbbing"; and a discussion about

masturbation.  Reeves Dep. at 121, 265-272, 346-347, 349-350; Def.'s Ex. 28 to

Reeves Dep.  Reeves testified in her deposition that Mitchell "encouraged the talk

show that was aired on a regular basis."  Reeves Dep. at 109.  Mitchell denied that he

every heard the X air programs, advertisements, or subject matter of a sexual nature

and he denied that he ever heard other employees in the office tell jokes about sexual

material or sexual subjects that aired on the radio.  Mitchell Dep. at 71-72.

When the morning radio show concluded, the X would transition to a music

format, and Reeves also was offended by some of the music that was played on the X. Reeves Dep. at 255, 306-309; Def.'s Ex. 31 to Reeves Dep. On May 3, 2003, Reeves heard a song on the office radio about a man and woman having sex that contained the lyrics "getting some ass." Reeves Dep. at 306-307. Reeves was so offended by the song, and she left the office and walked out into the hallway to avoid listening to the song. Reeves Dep. at 306-307; Def.'s Ex. 31 to Reeves Dep. On another occasion, Reeves was offended when the song "Crash" by the Dave Matthews Band was played on the office radio. Reeves Dep. at 313. Reeves stated in her deposition that she believed the song was about sex and that it was inappropriate for an office setting. *Id.* Reeves also stated that if she took time to tell someone about each of the songs that played on the office radio that she found offensive, then she would have been unable to perform her job. Reeves Dep. at 314.

Reeves was also offended by some of the commercial advertisements that she heard in the office that aired on the X. Reeves Dep. at 121. Specifically, Reeves was offended by the following advertisements that aired on X: an advertisement about a "perverse bikini contest" at a local night club; a Christmas advertisement that contained the statement "found her in bed with three elves and a candy cane[,] don't know what she was using that for"; an advertisement for a non-prescription drug called Proton that promised to increase one's sexual performance, please a partner,

12

and make one a "sexual tyrannosaurus rex"; a joke advertisement about cigars that were "targeted at the rich prick demographic"; an advertisement for a concert where there would be "sexual favors and more"; an advertisement for a bikini contest described as "hedonistic, sexy, and perverse"; and an advertisement for Chippendale's Dancers. Reeves Dep. at 121, 124, 127-128, 273-282; Def.'s Ex. 28 to Reeves Dep. After the advertisement for Proton was aired, Reeves overheard Mitchell make a statement in response to the advertisement that "[h]e's probably in a nursing home getting fired up." Reeves Dep. at 124, 127-128, 277; Def.'s Ex. 28 to Reeves Dep.

When Reeves would hear something that she found offensive on the office radio, she would occasionally change the station. Reeves Dep. at 288. Coworkers never prevented Reeves from changing the radio station. Reeves Dep. at 302. After she would change the channel, the radio would remain on the changed channel for a few hours. Reeves Dep. at 288. However, a coworker would change the station back to the X after a few hours. Reeves Dep. at 288, 310; Def.'s Ex. 31 to Reeves Dep. Sometimes Reeves would change the channel twice in one day. Reeves Dep. at 288. Bridges, a male employee, also changed the station a few times when something was on the radio that Reeves thought was offensive. Reeves Dep. at 293-294, 316-317. In addition, Bridges told Reeves that he was also offended by the radio station.

13

Reeves Dep. at 294.  Sometimes, instead of changing the channel, Reeves would turn the radio down or walk out of the office.  Reeves Dep. at 244-245.  Reeves also brought CDs to play in the office on three separate occasions.  Reeves Dep. at 298-300.  None of her coworkers objected to Reeves playing CDs.  Reeves Dep. at 299.

In January 2002 Reeves brought her own radio to the office to try to "drown out the sexually offensive language and conversation" that she heard on the radio and from employees.  Reeves Dep. at 294-296; Def.'s Ex. 31 to Reeves Dep.  Mitchell sent Reeves an e-mail advising her that only one office radio should be played because the crossover of the two radios playing together gave him a headache.  Reeves Dep. at 295-297; Def.'s Exs. 29 and 31 to Reeves Dep.  Reeves responded to Mitchell's e-mail and explained to him that she brought the radio so that she would not have to hear the offensive topics recently discussed on the morning show on the X, so she would not have to hear cursing in the office, and so she would not have to hear a discussion about naked women that she had overheard in the office.  Reeves Dep. at 295-296; Def.'s Ex. 29 to Reeves Dep.  Mitchell responded by telling Reeves that she could switch the radio station during the morning talk show or listen to CDs.  Reeves Dep. at 296;  Def.'s Ex. 29 to Reeves Dep.  Mitchell also informed Reeves that he would listen for any offensive office chatter and that she should let him know if it happened again.  Reeves Dep. at 296;  Def.'s Ex. 29 to Reeves Dep.  Mitchell

14

asked Reeves what radio station she preferred to hear, and Reeves responded that she would prefer to listen to the "'80s station" during the time when the morning talk show was aired on the X.  Reeves Dep. at 297; Def.'s Ex. 29 to Reeves Dep.   After the e-mail exchange between Reeves and Mitchell regarding the radio, Mitchell shut off the radio for three days.  Reeves Dep. at 298.  On August 9, 2002, Reeves went to turn down the volume on the channel when she heard something sexually offensive and Mitchell asked her to turn the volume back up.  Reeves Dep. at 302-303; Def.'s Ex. 30 to Reeves Dep.

In June 2002 Reeves contacted two CHRW transportation vice-presidents, Tim Manning and Molly DuBois, to discuss the work environment in the Birmingham CHRW office.  Reeves Dep. at 209; Manning Dep. at 6; DuBois Dep. at 6.  Reeves e-mailed both Manning and DuBois and told them that she was "having difficulty" but she did not discuss the details of her complaints in the e-mail.  Reeves Dep. at 211.  Reeves asked Manning if she could meet with him one-on-one when he came to Birmingham to discuss problems with the work environment and Manning agreed. Reeves Dep. at 210.  Reeves eventually spoke with DuBois on the telephone, and Reeves told DuBois about "three different things"--that she did not think it was fair that she had been denied a salary increase, that there was sexually offensive language and conversation in the office and that "you could cut the anger in the office with a

knife," and that she was having difficulty with the morning talk show that was played in the office. *Id.* at 212.  Reeves just gave DuBois a "very general description" of what was going on because she assumed that she was going to be able to meet with Manning or DuBois when they came to Birmingham.  Reeves Dep. at 213.  When Manning and DuBois came to Birmingham, Reeves did not meet with either of them one-on-one.  Reeves Dep. at 210-11, 213.  Reeves did not request a meeting with them because she "just assumed that they were going to follow through on their word."  Reeves Dep. at 215.

In January 2004 Reeves took a maternity leave to give birth to her first child. Reeves Dep. at 65-66.  On March 24, 2004, Reeves returned from maternity leave and she worked at CHRW for about two weeks.  Reeves Dep. at 67.  Reeves then resigned from CHRW to stay home with her child.  Reeves Dep. at 67-68.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Supreme Court has explained the summary judgment standard as follows:

16

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex*, 477 U.S. at 322-23.  The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  In meeting this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a genuine issue for trial.  See  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587; and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment.  Brown v. Am.

*Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir. 1991).

## DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII expressly provides that "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" *Id.* In order to state claim for hostile-environment sexual harassment under Title VII, the plaintiff must show the following:

> that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) *that the harassment must have been based on the sex of the employee;* (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (emphasis added).

CHRW argues, among other things, that summary judgment is due to be granted in its favor because it contends that Reeves failed to establish a genuine issue

of material fact whether the alleged harassment amounts to harassment based on Reeves's sex.  "The essence of a disparate treatment claim under Title VII is that an employee or applicant is intentionally singled out for adverse treatment on the basis of a prohibited criterion."  *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982).  "In proving a claim for a hostile work environment due to sexual harassment, therefore, the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment.  *Id.* at 904.  In cases where "men and women are accorded like treatment," there is no actionable sexual harassment because the "sexual harassment would not be based upon sex."  *Id.*  In determining whether alleged harassment is harassment based on sex, "'[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which member of the other sex are not exposed.'"  *Oncale v. Sundowner Offshore Serv.s, Inc.*, 118 S.Ct. 998, 1002, 523 U.S. 75, 80. (1998) (quoting *Harris v. Forlift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 372 (1993) (GINSBURG, J., concurring)).

The evidence presented demonstrates that the conduct Reeves found to be offensive was not motived by her sex.  The language used in the office to which Reeves objected was not directed at her, and there is no evidence demonstrating that Reeves was ever referred to in a derogatory manner.  The language to which Reeves

objected was spoken in front of both men and women.  In addition, the office  radio was played in a common area.  Therefore, both men and women were subjected to the language and the radio program that Reeves found to be offensive.  *See Henson*, 682 F.2d at 904 (harassment is not "based on sex" if "men and women are afforded like treatment").  Because the evidence demonstrates that both men and women were afforded like treatment, Reeves has failed to prove that she was "intentionally singled out for adverse treatment" because of her sex.  *Henson* 682 F.2d at 903.

Reeves argues that this court should reject CHRW's contention that because all CHRW employees, whether male or female, were subjected to the same treatment, that the alleged harassment is not based on sex.  Reeves cites no eleventh circuit authority to support her proposition.  Rather, Reeves cites a fourth circuit case, *Ocheltree v. Scollon Products*, *Inc.*, 335 F.3d 325 (4th Cir. 2003), to support her argument.  In *Ocheltree*, a female employee that worked in a costume production shop sued her employer alleging sexual harassment in violation of Title VII. *Ocheltree*, 335 F.3d at 330.  The plaintiff's male coworkers used female-form mannequins that were in the shop to engage in sexual antics in front of the plaintiff. *Id.* at 328.  One employee noted that the plaintiff's coworkers would so something sexual to the mannequin anytime the plaintiff was walking by.  *Id.*  On another occasion, a male coworker sang a song to the plaintiff with the lyrics "'[c]ome to me,

oh, baby come to me, your breath smells like c[o]m[e] to me." *Id.*  The plaintiff's male coworkers "expressed their enjoyment of the incident with much laughter." *Id.* On another occasion, a male coworker showed the plaintiff a photograph of a man's pierced genitalia and asked the plaintiff her opinion of the photograph. *Id.*  This event also generated laughter from her male coworkers. *Id.*  The plaintiff was convinced that her male coworkers engaged in a daily stream of sexual talk and antics in front of her because they enjoyed looking at her to see her reaction. *Id.* at 329. The employer  argued that the conduct was not based on sex because the conduct could have been seen by anyone in the shop and it was equally offensive to men and women. *Id.* at 332.  The court rejected this argument and held that "[a] trier of fact may reasonably find discrimination, for example, when a woman is the individual target of open hostility because of her sex [.]" *Id.* at 331.  The court found that a reasonable jury could conclude that the plaintiff's male coworkers behaved in a way to make the plaintiff uncomfortable and self-conscious, that much of the conduct was particularly offensive to women, and that much of the conduct was intended to provoke the plaintiff's reaction as a woman. *Id.*  The court also noted that none of the men in the workplace were subjected to the same embarrassment and that a jury could reasonably conclude from the evidence presented that the men engaged in the conduct because they enjoyed watching and laughing at the reactions of the plaintiff. *Id.*

21

Although the evidence demonstrated that some of the men in the shop were also offended by the sexual talk and antics, there was no evidence to demonstrate that the conduct was aimed at getting an embarrassed reaction from these men or that it was "calculated to generate laughter at the expense of any man." *Id.*

Even if this court were to follow the holding in *Ocheltree*, the facts of this case are distinguishable from the facts of *Ocheltree*. Unlike the evidence presented in *Ocheltree*, there is no evidence in this case demonstrating that offensive language was spoken in the office or that the radio was played in the office in an attempt to make Reeves an individual target of harassment because of her sex. Unlike the male employees in *Ocheltree*, Reeves's male coworkers did not subject her to foul language or the radio broadcast in an attempt to embarrass Reeves or to get a reaction from Reeves. Rather, the evidence demonstrates that Reeves was treated the same as her male coworkers in that both she and her male coworkers were subjected to the conduct of which she complains. The facts of this case are clearly distinguishable from the facts of *Ocheltree* because the evidence in this case does not establish that Reeves was singled out as an individual target of harassment.

Reeves also argues that there is substantial evidence demonstrating that she was subjected to harassment based on sex because, when she complained to Mitchell about the language used in the office and about the radio, he did not take any action

to address her complaints.  However, the evidence demonstrates that Reeves was permitted to change the station when she heard something offensive on the office radio and none of her coworkers ever prevented her from changing the channel.  In addition, Mitchell told her that she was permitted to bring CDs to play on the office radio.  Reeves's argument that Mitchell failed to take action because of her sex is contradicted by the evidence showing that a male coworker also turned down the radio when Reeves heard something on the radio that she believed was offensive and it is contradicted by the evidence demonstrating that the same coworker was offended by things he heard on the office radio.  In addition, male coworkers were likewise offended by the language in the office, both spoken and broadcast.  Lastly, there is no evidence demonstrating that the conduct to which Reeves objected--foul language and the playing of the radio in the office--continued after she complained to Mitchell because of her sex or that her coworkers continued this conduct in order to make her the individualized target of hostility because of her sex.  Further, when Reeves voiced her concerns to Manning and DuBois, Reeves never indicated to them that she felt that she was being harassed because of her sex.  Rather, in a telephone conversation with DuBois, Reeves stated that she thought it unfair that her salary had not increased, that offensive language was being spoken in the office, that there was too much anger in the office, and that the morning talk show aired in the office was

23

offensive.

Reeves also argues that the evidence demonstrating that sex specific terms were used in the office provides sufficient evidence that Reeves was the object of harassment on the basis of her sex.  Again, there is insufficient evidence to demonstrate that the use of this language was motivated by Reeves's sex.  *See Mendoza*, 195 F.3d at 1248 n. 5.  (holding that a plaintiff must show that "but for the fact of her sex, she would not have been the object of harassment.")  It is undisputed that none of the language to which Reeves objected was directed at her.  Further, the use of the words "bitch" and "whore" in the office do not automatically amount to discrimination based on sex "merely because the words used have sexual content or connotations."  *Oncale*, 523 U.S. at 80.  There is no evidence demonstrating that these words were used to refer to Reeves or that these words were used to refer exclusively to women.  Rather, the evidence demonstrates that these words were used to refer to both  to men and women.

Although the evidence may establish that Reeves's was subject to an unprofessional work environment at CHRW, "Title VII is not a federal 'civility code.'"  *Mendoza*, 195 F.3d at 1245 (quoting *Oncale*, 523 U.S. at 81).  The court finds that Reeves has failed to establish a genuine issue of material fact that the conduct she found offensive amounted to harassment on the basis of her sex.

## CONCLUSION

Having considered the foregoing, the court finds that the plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial against CHRW.  It is therefore **ORDERED** that summary judgment shall be **GRANTED** in favor of the defendant, and the plaintiff's claims against this defendant shall be **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** this the 11th day of December 2006.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE